**Frank P. GREENE, M.D., Plaintiff,**

v.

**Otis BOWEN, M.D., Secretary, Department of Health and Human Services, United States Government; California Medical Review, Inc., Defendants.**

**No. Civ. S–86–0625 LKK.**

United States District Court, E.D. California.

July 2, 1986.

Thomas J. Doyle, Weintraub, Genshlea, Hardy, Erich & Brown, Sacramento, Cal., Catherine I. Hanson, Hassard, Bonnington, Rogers & Huber, San Francisco, Cal., for plaintiff.

Richard Bender, Asst. U.S. Atty., Sacramento, Cal., for Federal Defendants.

Ronald S. Bushner, Lillick, McHose & Charles, San Francisco, Cal., for California Medical Review, Inc.

## ORDER

KARLTON, Chief Judge.

On May 28, 1986, plaintiff Frank P. Greene, M.D. filed a complaint for declaratory and injunctive relief against the Acting Commissioner, Department of Health and Human Services, and California Medical Review, Inc. On the same date, plaintiff ex parte sought a temporary restraining order. The plaintiff sought to restrain the department from excluding Dr. Greene from the Medicare program and from publishing a notice of the exclusion, pending administrative review.

Pursuant to Local Rule 231, the plaintiff gave notice to the United States of his intention to seek a restraining order, and the matter was heard in Chambers on the following day. After the argument, the court declined to restrain the exclusion of the defendant from the Medicare program, but did grant a temporary restraining order prohibiting publication of the exclusion as otherwise would be required by 42 C.F.R. § 474.52(d). The court did condition that order, however, upon the doctor's giving notice to his patients that during the interim period he would not be accepting any Medicare patients. A hearing on the motion for preliminary injunction was set for June 10, 1986. At the hearing, the court took oral testimony from the plaintiff and received various stipulations and doc-

uments into evidence. At the close of the hearing, the court continued its previous restraining order pending disposition of the motion for preliminary injunction, which was taken under submission. By this order, the court herein disposes of that motion.

The facts necessary for resolution of the question of whether a preliminary injunction should issue may be stated relatively briefly. The plaintiff is a physician living and practicing medicine in Tehama County, California. He is a fellow of the American College of Surgeons, President of the Tehama County Medical Society, and one of two board-certified general surgeons currently serving the Tehama County area.

The court can take judicial notice of the fact that Tehama County is a physically large county, with a small population of approximately 38,000 people. The doctor has testified that in the fiscal year April 1985 to April 1986, he received approximately $115,000 in reimbursement from Medicare, which represented approximately 65% of his gross income for that year.

In October 1985, California Medical Review, Inc., a PRO,[1] while engaging in its routine review process, identified possible quality of care problems at Corning Memorial Hospital. As a follow-up, the PRO randomly selected various Federal Medicare admissions at the hospital for a further in-depth review. Based on that review, the PRO identified two cases in which there was a suggestion of a possible "gross and flagrant violation," *see* 42 U.S.C. § 1320c–5(b), by the plaintiff of his duties under the Act. Accordingly, the PRO forwarded a letter to Dr. Greene on November 20, 1985, informing him of the concerns and of his right to submit to the PRO additional information or a written request for a meeting. *See* Plaintiff's Memorandum of Points and Authorities in Support of Application for Injunctive Relief ("Plaintiff's Memorandum"), Exhibits A, A(1), and A(2).

In response, on December 6, 1985, the PRO received a letter from Dr. Greene requesting a meeting with the PRO to review and discuss the PRO's initial determination; plaintiff also submitted rebuttal statements. *See* Plaintiff's Memorandum, Exhibits B, B(1), and B(2). On December 10, 1985, however, plaintiff waived his right to a meeting with the PRO and in lieu thereof submitted written responses. *See* Plaintiff's Memorandum, Exhibit D. On December 13, 1985, the PRO affirmed its initial determination. *See* Plaintiff's Memorandum, Exhibit F. On December 30, plaintiff submitted additional written material to the PRO in support of his handling of the two cases. *See* Plaintiff's Memorandum, Exhibits G, G(1), G(2), and G(3). On January 24, 1986, the PRO sent Dr. Greene the reports of two consultants and informed plaintiff that he could submit to the PRO additional information or a written request for a meeting to discuss this supplemental material. *See* Plaintiff's Memorandum, Exhibit I.

After further review by a variety of doctors, the PRO notified plaintiff on February 25, 1986, that it had determined that he had in two cases grossly and flagrantly violated his obligations to provide care which meets professionally recognized standards. *See* Plaintiff's Memorandum, Exhibit L. Accordingly, the PRO recommended to the Office of the Inspector General of the Department of Health and Human Services that the plaintiff be excluded from participation in the Medicare program for a two-year period. The letter further informed the plaintiff that he could submit additional material relating to the exclusion recommendation to the Office of the Inspector General within thirty (30) days. *See* Plaintiff's Memorandum, Exhibit L.

---

1. A PRO (peer review organization) is either composed of licensed doctors of medicine and osteopathy practitioners in the area who are representative of the practicing physicians in the area, or alternatively, has the services of such physicians available to it. 42 U.S.C. § 1320c–1. The Secretary of the Department of Health and Human Services is authorized to establish geographic areas throughout the nation within which PRO's may be designated, and to contract with PRO's to perform a review of the professional activities of physicians and other health care practitioners within these specific geographical areas. 42 U.S.C. § 1320c–3.

The Office of the Inspector General conducted a further review of all of the evidence relating to the matter and concluded that the sanction was reasonable, was supported by the documents provided by the PRO, and should proceed. Accordingly, the Office of the Inspector General notified Dr. Greene in writing on May 8, 1986, that it had determined that in two cases he had grossly and flagrantly violated his obligations to provide care of a quality which meets professionally recognized standards, and that in the third case, he had substantially failed to provide care of a quality which met professionally recognized standards.[2]

By virtue of the latter determination, the doctor, although he has a right to a full administrative hearing, 42 U.S.C. § 1320c–5(b)(4) and 42 U.S.C. § 405(b), will be excluded from further treatment of Medicare patients, and that fact will be published in a local newspaper, 42 C.F.R. § 474.52(d). The doctor seeks a restraining order as to both consequences.

## I

## RESOLUTION OF THE MOTION

### A. *Standards*

■ The purpose of the preliminary injunction as provided by Fed.R.Civ.P. 65 is to preserve the relative positions of the parties—the status quo ante—until a full trial on the merits can be conducted. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). "The [Supreme] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). The limited record usually available on such motions renders a final decision on the merits inappropriate. *Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420 (1973).

In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction. Under the first test, the court may not issue a preliminary injunction unless each of the following requirements is satisfied: (1) the moving party has demonstrated a likelihood of success on the merits, (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted, (3) in balancing the equities, the non-moving party will not be harmed more than the moving party is helped by the injunction, and (4) granting the injunction is in the public interest. *Martin v. International Olympic Committee*, 740 F.2d 670, 674–75 (9th Cir. 1984). Under the second "alternative" test, the court may not issue a preliminary injunction unless the moving party demonstrates *"either* a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* Under this part of the alternative test, even if the balance tips sharply in favor of the moving party, it must be shown as an "irreducible minimum" that there is a "fair chance of success" on the merits. *Id.* The moving party carries the burden of proof on each of these elements. *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1203 (9th Cir.1980).

The two tests are not separate and unrelated; each represents the "extremes of a single continuum." *Benda v. Grand Lodge of International Association of Ma-*

---

**2.** The PRO's recommendation was premised upon the treatment of three patients. M.J., a 72–year old patient, had been admitted with a perforated ulcer and generalized peritoneal spillage. In particular, the PRO regarded the plaintiff's failure to provide post-operative care within 48 hours after performing surgery as falling below the standard.

Concerning patient E.M., the PRO determined that once again Dr. Greene had inadequately evaluated and treated post-operatively.

Finally, the PRO considered the case of H.V., which related to an allegation of premature discharge from acute care to a lower level of care.

*chinists and Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). In certain instances, such as environmental and public-entitlement cases, the public interest is an important factor. *Lopez v. Heckler,* 725 F.2d 1489, 1498 (9th Cir.), *vacated on other grounds,* — U.S. ——, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984). *See also Weinberger,* 456 U.S. at 312, 102 S.Ct. at 1803.

### B. *Subject Matter Jurisdiction*

Under whichever standard is applied, it is clear that the moving party must demonstrate some chance of success on the merits. *Benda,* 584 F.2d at 314–15. The Government asserts that the plaintiff has no chance of success on the merits whatsoever, since this court lacks subject matter jurisdiction. I first consider that issue.

The Social Security Act provides, in pertinent part, that any health care provider:

... who is dissatisfied with a determination made by the Secretary under [42 U.S.C. § 1320c-5(b)(1) ] shall be entitled to reasonable notice and opportunity for a hearing thereon by the Secretary to the same extent as is provided in [42 U.S.C.] section 405(b) ... and to judicial review of the Secretary's final decision after such hearing as is provided in [42 U.S.C.] section 405(g)

. . . . .

42 U.S.C. § 1320c-5(b)(4).

As the Government notes, under § 405(g), the decision sought to be reviewed must be "final," which in this context means the Appeal Council decision upon review of the administrative law judge's decision, or the Appeal Council's dismissal of a request for review. *See* 42 C.F.R. §§ 405.1566–.1568. Because an administrative law judge has not yet rendered a decision, it is the position of the United States that this court is without subject matter jurisdiction.

Two very recent cases determined by the United States Supreme Court bear upon the question of the finality requirement of 42 U.S.C. § 405(g). *See Bowen v. City of New York,* — U.S. ——, 106 S.Ct. 2022, 90 L.Ed. —— (1986), and *Bowen v. Michigan Academy of Family Physicians,* — U.S. ——, 106 S.Ct. 2133, 90 L.Ed. —— (1986). In *Bowen v. City of New York,* the Court was faced with a challenge to a secret policy of the Social Security Administration designed to frustrate both the statute and the published regulations implementing it. Among other issues tendered to the Supreme Court was the propriety of including within the class certified by the district court social security claimants who had not exhausted their administrative remedies. As the Court explained, the "final decision" requirement embodied in section 405(g),

"consists of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be waived by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary."

— U.S. at ——, 106 S.Ct. at 2031, *quoting Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976). In *Bowen v. Michigan Academy of Family Physicians,* the Court was faced with the issue of whether Congress had barred judicial review of regulations promulgated under Part B of the Medicare Program. Starting from the proposition that there is a "strong presumption that Congress intends judicial review of administrative action," — U.S. at ——, 106 S.Ct. at 2135, the Court determined that the regulations were reviewable.

Central to the Court's determination in both *Bowen* cases was the character of the plaintiff's complaint. In the New York case, the Court found that the issues tendered in the litigation were collateral to the determinations which would necessarily be made by the Secretary in the course of the administrative hearings, in that the class members "neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow

the applicable regulations." *Bowen v. City of New York,* —— U.S. at ——, 106 S.Ct. at 2031. In like manner, in the Michigan case, the court challenge did not seek a particular amount of compensation, but rather attacked the manner by which the amounts were determined. *Bowen v. Michigan Academy of Family Physicians,* —— U.S. at ——, 106 S.Ct. at 2135.

▮ At oral argument, this court and both counsel engaged in extended discussion of the meaning of the notion that an issue is collateral to a substantive claim of entitlement. Whatever the outer limits of the notion of "collateral issues" may be, it appears to the court that where the plaintiff does not seek the specific entitlement which is the subject of an administrative proceeding, but rather challenges the standards under which the administrative agency proposes to make that determination, the issue is collateral.[3]

In the instant case, plaintiff tenders a series of arguments to demonstrate that the issues raised in his lawsuit are collateral to the administrative hearing, and thus subject to waiver of the exhaustion requirement. Plaintiff's position, perhaps somewhat oversimplified, may be summarized as tendering three essential propositions. First, plaintiff asserts that given the grave consequences of the doctor's exclusion, he is entitled to a hearing preceding his exclusion. Second, he contends that the PRO failed to follow the Secretary's regulations concerning, for example, the amount of time a health care provider is to be given to respond to claims of a violation of statutory duties. Finally, he asserts that the determination made by the PRO that the plaintiff had been guilty of a willful and flagrant violation of his obligations was made by the application of an inappropriate standard of care. In essence, he argues that given the geographic relationship of Corning Hospital relative to his residence, and the fact that there are only two board-certified general surgeons in Tehama County, his practice of turning post-operative care over to the referring physician (ordinarily a general practitioner) was well within the standard of care in Tehama County. He notes, however, that the PRO determination appears to have been made by the application of the standard of care in San Francisco, a compact geographic community where there are, if anything, a surfeit of physicians. He thus argues that the determination of willful and flagrant violations, upon which both the suspension and publication are predicated, was the result of the application of an inappropriate medical standard. It is upon this question that the court will focus its attention. Put succinctly, the issue is whether the contention that the PRO applied an inappropriate standard of care is sufficiently collateral to the question of entitlement, so that the plaintiff is not required to exhaust his administrative remedies before seeking relief in the district court.

The Government rejects the contention by asserting not only that the question is not collateral, but also that it is a non-issue. It asserts that the statute does not define willful and flagrant violations, but that under the regulations, the standard of care appropriate to a geographic area is irrelevant.[4]

The applicable regulation provides that:

---

3. In several actions brought by Medicare providers before exhausting administrative remedies, courts have found that subject matter jurisdiction was absent. *See, e.g., Homewood Professional Care Center, Ltd. v. Heckler,* 764 F.2d 1242 (7th Cir.1985); *Americana Healthcare Corp. v. Schweiker,* 688 F.2d 1072 (7th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983); *Northlake Community Hospital v. United States,* 654 F.2d 1234 (7th Cir. 1981); *Kechijian v. Califano,* 621 F.2d 1 (1st Cir.1980). However, these courts did not face precisely the issue tendered to this court, and they did not have the benefit of the Supreme Court's recent decisions.

4. As I explain below, I do not agree with the Government that plaintiff's argument tenders a non-issue; however, even if I did agree that plaintiff's position was unsupportable, that would not resolve the question of whether the issue was sufficiently collateral so that plaintiff is relieved of the obligation to exhaust the administrative process.

"Gross and flagrant violation" means a violation of an obligation has occurred in one or more instances which presents an imminent danger to the health, safety or well-being of a Medicare beneficiary or places the beneficiary unnecessarily in high-risk situations.

42 C.F.R. § 474.0(b).

■ From the definition, it appears that two alternative tests exist. First, a violation of an "obligation" is gross and flagrant if it presents an "imminent danger" to the health, safety, or well-being of a Medicare beneficiary. Second, a violation of an "obligation" is gross and flagrant if it places the beneficiary "unnecessarily" in high risk situations. As I shall now explain, it appears to the court that either test implicates questions of the appropriate standard of care.

The definition is predicated upon the violation of an "obligation." An obligation is defined by the regulations to mean "any of the obligations specified at section 1156(a) of the Act." 42 C.F.R. § 474.0(b). In turn, the Act defines an obligation, in pertinent part, as the requirement that "any health care practitioner ... assure, to the extent of his authority that services ... (2) will be of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a). Thus, by its terms, the statute requires examination of alleged failures under "professionally recognized standards of health care." Given that requirement, the question of what standards, and where they are applicable, is tendered by the very language of the statute. Moreover, other provisions of this reticulated statute further suggest that the standard of care in a particular community may be relevant. Thus, the statute provides that the PRO:

[S]hall, consistent with the provisions of its contract under this part, apply professionally developed norms of care, diagnosis, and treatment based upon typical patterns of practice within the geographic area served by the organization as principal points of evaluation of review, taking into consideration national norms where appropriate.

42 U.S.C. § 1320c-3(a)(6).

Moreover, the second test contained in the regulatory definition of "gross and flagrant violation" does not require a standard independent of local standards of practice. That test defines gross and flagrant violations as those which place beneficiaries in "unnecessarily" high risk situations. The question of necessity, however, suggests the need at least to consider local medical conditions. A single example will perhaps illustrate the court's point. Assume for a moment that the question is whether a doctor in a remote area of Alaska has placed patients at an unnecessarily high risk by receiving telephone inquiries from nurses in Eskimo villages at even more remote areas and attempting to prescribe by phone. Clearly, such conduct would violate the standard of care in San Francisco, and, in San Francisco, would place his patients in an "unnecessarily" high risk situation. For the doctor in Alaska, on the other hand, this method of consultation may be the only possible one, and thus not at all unnecessary or a gross and flagrant violation.[5]

The court's view that the statute and regulations may reasonably be read to require a consideration of the standard of care relevant to the community in which the doctor practices is supported by other textual material. Thus the regulation requires that:

For the conduct of review a PRO must—

(1) Establish written criteria based upon typical patterns of practice in the PRO area, or use national criteria where appropriate; ... [varying criteria and standards].

A PRO may establish specific criteria and standards to be applied to certain

---

**5.** The court does not mean even to suggest that the situation in Tehama justified Dr. Greene's conduct. On the contrary, the point which the court seeks to make is only that the question of necessity by its terms requires consideration of the realities and possibilities of local medical practice.

locations and facilities in the PRO area if the PRO determines that—

(1) The patterns of practice in those locations and facilities are substantially different from patterns in the remainder of the PRO area; and

(2) There is a reasonable basis for the difference which makes the variation appropriate.

42 C.F.R. § 466.100(c) and (d).

I conclude from the above that plaintiff's argument that a PRO must consider the standard of care in a particular community is not without substance. That conclusion, of course, does not resolve the issue of whether the question is collateral. It appears to the court that although the definition of a collateral issue is not wholly certain, the issue tendered is collateral to the hearing before the administrative law judge.

■ The purpose of the hearing before the administrative law judge is to determine whether the plaintiff should be excluded for two years. Nonetheless, because of the structure of the regulations, by virtue of the PRO's recommendation, the doctor is presently excluded and but for this court's previous order, that exclusion would be a matter announced by the local press. The question of whether the PRO applied the correct standard, and thus improperly occasioned the harm suffered by the doctor, seems "collateral" in any ordinary meaning of the word to the issues to be tried by the administrative law judge. Put another way, given the fact that the PRO's determination process is complete, and that the matter now pends before the Secretary, the question of whether the PRO applied the appropriate standard appears to be collateral to the matter now before the Secretary.

■ I note, however, that the question of the collateral nature of an issue may also involve questions of the relief sought. Thus, the plaintiffs in *Bowen* "neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow the applicable regulations." *Bowen v. New York,* —— U.S. at ——, 106 S.Ct. at 2031. In this regard, it must be noted that the plaintiff does not seek to have the court compel the application of the appropriate standard, but rather seeks to enjoin his exclusion from the program and the publication of his exclusion. Thus, plaintiff here may be read as both challenging the PRO's failure to follow the applicable regulations and seeking an award of benefits in this court. Although plaintiff's prayer has given the court pause, I do not believe that it deprives the court of jurisdiction. First, as an ordinary matter, the plaintiff's prayer is not considered part of the complaint. 3B C. Wright & A. Miller, *Federal Practice and Procedure* § 1255. *See also Nester v. Western Union Telegraph Co.,* 25 F.Supp. 478 (S.D.Cal.1938), *aff'd,* 106 F.2d 587 (9th Cir.1939), *reversed on other grounds,* 309 U.S. 582, 60 S.Ct. 769, 84 L.Ed. 960 (1940). Second, of course, this court need not grant plaintiff's ultimate prayer, but may fashion an appropriate remedy along the lines that Judge Weinstein fashioned in *Bowen v. New York.*[6]

Given all of the above, I find that this court has subject matter jurisdiction to consider whether the PRO is obligated to apply a standard of care relevant to Tehama County and whether it did so.[7] Having

6. As the Supreme Court explained, "the relief afforded by the District Court is fully consistent with the policies underlying exhaustion. The court did not order that class members be paid benefits. Nor does its decision in any way interfere with the agency's role as the ultimate determiner of eligibility under the relevant statutes and regulations. Indeed, by ordering simply that the claims be reopened at the administrative level, the District Court showed proper respect for the administrative process." —— U.S. at ——, 106 S.Ct. at 2031.

7. By virtue of this determination, I need not at this time consider whether plaintiff's allegations concerning the alleged violation by the PRO of the notice and opportunity to respond provisions of the regulations is also within this court's subject matter jurisdiction. I note, however, that in *Bowen* the Supreme Court held that subject matter jurisdiction might not lie where plaintiff alleges "mere deviation from the appli-

rejected the Government's assertion that plaintiff has no chance of prevailing on the merits because this court is without subject matter jurisdiction, I turn to the question of whether, given subject matter jurisdiction, a preliminary injunction should be granted.

### C. *Injunctive Relief*

The Government argues that preliminary injunctive relief is inappropriate because the plaintiff has failed to demonstrate the existence of irreparable injury. It argues that at most plaintiff tenders only two forms of injury, namely, the loss of income and the loss of reputation. It argues that neither threatened injury is irreparable within the meaning of the cases.

■ It is, of course, true that as a general matter monetary injury, even severe monetary injury, is an insufficient ground for injunctive relief. *Sampson v. Murray,* 415 U.S. 61, 90–92, 94 S.Ct. 937, 952–953, 39 L.Ed.2d 166 (1974). That is because, as a general matter, monetary loss may be compensated at law. Put another way, a person suffering monetary injury has an adequate remedy at law and accordingly equitable relief should be denied. That general proposition, however, does not apply in the instant case. Thus, unlike the probationary employee in *Sampson,* the doctor, if he is ultimately vindicated, will have no apparent action against anyone to recover the monetary loss sustained during his suspension.[8] Certainly, the Government has not suggested any action that the doctor could take at law subsequent to his vindication in the administrative process, nor does any occur to the court. It thus appears that the monetary

deprivation that the doctor will experience during the pendency of his suspension and prior to his reinstatement (if such should be the case) is irreparable in every ordinary meaning of the term.

■ Moreover, it is clear that the publication of the doctor's suspension in the local newspapers in a small county such as Tehama will have a devastating effect on his professional reputation far beyond his Medicare practice. While it may well be that under present Supreme Court doctrine mere reputation is not a liberty interest protected by the Due Process Clause, *see Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Otto v. Heckler,* 781 F.2d 754 (9th Cir.1986), there is no doubt that reputation is a matter of the utmost concern to the law. *See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. ——, 105 S.Ct. 2939, 2944–46, 86 L.Ed.2d 593 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348–49, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974); *Rosenblatt v. Baer,* 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring). While it is certainly true that an administrative determination in Dr. Greene's favor will ameliorate the damage to his reputation, it is also true that "in many cases the ultimate absolution never catches up with the stigma of the accusation." *Sampson,* 415 U.S. at 94, 94 S.Ct. at 954 (Douglas, J. dissenting). Clearly, unlike the probationary employee in *Sampson,* here the threatened reputational damage occasioned by the publication in the newspaper of the doctor's suspension tenders a much more serious threat of irreparable injury.[9]

cable regulations in his particular administrative proceeding. In the normal course, such individual errors are fully correctable upon subsequent administrative review since the claimant on appeal will alert the agency to the alleged deviation." —— U.S. at ——, 106 S.Ct. at 2031.

I also need not consider at this stage plaintiff's contention that the gravity of the harm requires a pretermination hearing.

**8.** As the court emphasized in *Sampson,* the legislative history of the Back Pay Act demonstrated that monetary relief provided therein was in-

tended to be the usual, if not the exclusive, remedy for wrongful discharge of probationary employees. *Sampson,* 415 U.S. at 90–91, 94 S.Ct. at 952–953.

**9.** The above comments should not be read as holding that the doctor does not have a liberty interest. While it is clear that reputation alone is an insufficient predicate for a claimed deprivation of a liberty interest, defamation coupled with a significant alteration in legal status justifies the invocation of procedural safeguards. *See Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct.

564

I thus find that under the circumstances, the doctor has demonstrated a threat of immediate irreparable injury. I now turn to the question of the balance of hardships and the public interest.

■ I have noted above that the doctor has tendered a fair grounds for litigation of the question of whether his suspension was accomplished in accordance with the appropriate medical standard. In examining the hardships, I have noted the doctor's lost income and reputation, as well as his loss of the status of a doctor authorized to treat Medicare patients. The Government, on the other hand, argues that those hardships are seriously outweighed by the public interest in insuring that doctors provide adequate medical care to Medicare patients. This is a very serious and heavy factor weighing against granting of injunctive relief. Nonetheless, it appears to the court that that consideration, as serious as it is, does not resolve the case against granting a properly drawn injunction. As I explain below, a properly drawn injunction will guard against the dangers which the Government seeks to avoid, while at the same time preserving to the doctor his rights pending resolution of the issues tendered by this litigation.

From all that appears from the record, the major contention of the Government is not that Dr. Greene is an incompetent surgeon in terms of his education, skills or technique. Rather, the Government contends that his gross and flagrant violations of his obligations under the Act are the result of his failure to personally provide post-operative care, leaving that task to the local referring physician.[10] Under the circumstances, it would appear to the court that an injunction could and should be framed in such a manner as to require the doctor to personally provide post-operative care to patients upon whom he has operat-

ed, and that, so drawn, an injunction will limit any hardship to the Government and serve the public interest.

Accordingly, the court now orders as follows:

The defendants, and each of them, and all persons acting in concert with them, are hereby restrained and enjoined from:

1. Suspending plaintiff as a provider of medical services under the Medicare Act, or publishing any statement to the effect that he is so suspended, provided that the plaintiff shall not perform any surgery upon any patient under circumstances in which he cannot personally provide post-operative care;

2. This order is effective until further order of the court, but shall not be construed as preventing an administrative hearing under the provisions of 42 U.S.C. § 1320c–5(b)(4).

3. A bond in the sum of One Hundred Dollars ($100) is now set.

IT IS SO ORDERED.

1155, 1164, 47 L.Ed.2d 405 (1976). Due process attaches where defamation is coupled with the alteration in "a right of status previously recognized." *Id.* at 711, 96 S.Ct. at 1165. Here, of course, the doctor suffers not only the readily apparent injury to his reputation, but is deprived of his status as a doctor eligible under

federal law to treat Medicare patients and receive federal reimbursement therefor.

**10.** The court recognizes that the PRO also was disturbed by the doctor's apparent failure to appreciate the seriousness of that failure after the PRO brought it to his attention.