John DOE, M.D., Plaintiff,

v.

Otis BOWEN, M.D., Defendant.

Civ. A. No. 87–1068–WD.

United States District Court,
D. Massachusetts.

July 30, 1987.

Robert A. Griffith, Paul W. Shaw, Boston, Mass., for plaintiff.

Jeffrey Robbins, Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDERS

(Expurgated [1] August 6, 1987)

WOODLOCK, District Judge.

The plaintiff, Dr. John Doe, a psychiatrist providing services to recipients of Medicare and Medicaid, has been informed by the Office of Inspector General ("OIG") of the Department of Health and Human Services that he will be suspended—with attendant public notice—for a period of one year from further participation in such programs. This administrative action relates to *dismissal* of a criminal complaint in the Boston Municipal Court, as to which the record was sealed, involving the alleged submission of a single false Medicaid claim for not more than $26.00.

The disposition agreement from which the dismissal arises was designed by counsel for Dr. Doe and prosecutors from the Massachusetts Department of the Attorney General's Office to insure that Dr. Doe's participation in the disposition would not constitute a "conviction" within the meaning of the Social Security Act, Title 42 U.S.C. § 1320a–7.

The OIG, however, thinks otherwise and apparently grounds the notice of suspension on a reading of a recent amendment to the statute rejected by counsel in the criminal proceeding. Faced with the prospect that his suspension will commence before there has been an independent determination of the applicability of the new amendments to the type of disposition agreement in his case, Dr. Doe has brought this action seeking interim injunctive relief to stay the suspension pending final resolution of this question of first impression.

Dr. Doe's resort to judicial review at this stage in the administrative proceeding is burdened with substantial difficulties in overcoming doctrines of judicial deference which gather together under the rubric of exhaustion of administrative remedies. After extended consideration, prompted and made more piquant by my gratuitous conclusion that the OIG's interpretation of the statute is erroneous, *see infra* note 5, and consequently that the suspension and related sanctions are inappropriate, I find that I must deny the preliminary injunction request and dismiss the complaint because a federal district court lacks subject matter jurisdiction to hear a complaint such as Dr. Doe's at this stage in the administrative process.

### I

The suspension provision relevant here, Title 42 U.S.C. § 1320a–7(a), requires that individuals convicted of Medicare or Medicaid Program related crimes [2] be barred from participation in Medicare by the Secretary of the Department of Health and Human Services, that the Secretary direct state authorities to impose a similar bar from Medicaid participation, that the Secretary notify state licensing authorities, and, under § 1320a–7(d), that reasonable notice of the action be given to the public.

---

1. Several days after the filing of this memorandum, the plaintiff moved for a protective order or to have the record in this case sealed in order to prevent disclosure of the identity of the plaintiff. This motion was assented to by the government. Because the record of the underlying state criminal proceeding was sealed, I allowed this otherwise untimely motion, *see generally* Local Rule 25(d) of the United States District Court for the District of Massachusetts. To preserve the confidential treatment afforded the papers by allowance of the motion, this version of the previously released "Memorandum and Orders" has been expurgated to delete direct references to the plaintiff's name and other identifying facts.

2. The definition of conviction was the subject of the recent statutory revision. Under the statute, Title 42 U.S.C. § 1320a–7(f), as amended by the Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, § 9317(c), a physician is considered to have been "convicted" of a program-related criminal offense:

   (1) when a judgment of conviction has been entered against the physician or individual by a Federal, State, or local court, regardless of whether there is an appeal pending or whether the judgment of conviction or other record relating to criminal conduct has been expunged;

   (2) when there has been a finding of guilt against the physician or individual by a Federal, State, or local court;

   (3) when a plea of guilty or nolo contendere by the physician or individual has been accepted by a Federal, State, or local court; or

   (4) when the physician or individual has entered into participation in a first offender or other program where judgment of conviction has been withheld.

The "conviction" upon which the OIG relies is said to have arisen under § 1320a–7(f)(4) when Dr. Doe "entered into participation in a first offender or other program where judgment of conviction has been withheld."

## A

After a three-year grand jury investigation of Dr. Doe's Medicaid billing practices, the Massachusetts Department of the Attorney General's Office brought a complaint in the Boston Municipal Court based on the alleged submission of one invoice for not more than $26.00. No question of the quality of care rendered to patients by Dr. Doe was involved in the investigation. The complaint was subject to a special Massachusetts dispositional practice under Mass. Gen.L. ch. 276, § 87 (1980).[3]

Dr. Doe entered a plea of not guilty on October 15, 1986. Throughout the pendency of the complaint Dr. Doe maintained his innocence and made no admission of facts which could support a conviction. Nor did the Court make any findings of fact sufficient to warrant a conviction; indeed, the Court was never apprised of the facts of the case.

Pursuant to the disposition agreement, Dr. Doe for his part was placed on probation for a period of two months after arraignment and plea. In addition, he agreed to pay $3,000 in costs of the Attorney General's investigation.[4] For its part, the Commonwealth agreed not to bring any civil or criminal actions based on any matter that was the subject of the investigation.

On January 5, 1987, the case against Dr. Doe was dismissed without a change of plea or any admissions by the defendant or finding by the Court. In addition, the Court sealed the record in the case.[5]

3. Section 87 gives various trial court divisions of the Commonwealth broad authority to "place on probation in the care of its probation officer any person before it charged with an offense or a crime for such time and upon such conditions as it deems proper, with the defendant's consent, before trial and before a plea of guilty, or in any case after a finding or verdict of guilty. . . ."

4. It is apparent Dr. Doe was extraordinarily vigorous in asserting his position during the course of the investigation. *See generally Commonwealth v. Kobrin*, 395 Mass. 284, 479 N.E.2d 674 (1985) (upholding assertion of psychotherapist-patient privilege).

5. An affidavit submitted in this Court by the former Chief of the Medicaid Fraud Control Unit establishes that the Massachusetts Attorney General's Office understood and agreed that the disposition arrangement for Dr. Doe should be carefully styled to avoid its classification as a conviction under § 1320a–7. This intent would appear to have been realized by their use of Mass.Gen.L.Ch. 276, § 87.

There is no doubt that Congress by its amendments to the Omnibus Budget Reconciliation Act sought to expand the types of criminal dispositions which would be considered convictions. However, it appears from the plain language of the statute that it did not intend to reach all encounters between those who provide Medicare/Medicaid services and the criminal courts. Subsection (f)(4) speaks of the form of criminal disposition "where judgment of conviction has been withheld." On its face, this language plainly anticipates only those dispositions in which the actual entry of judgment of conviction is a simple ministerial act. This would occur, for example, when there has been an admission of the essential elements of the crime or an adjudication of guilt by a court but where for administrative purposes the actual judgment of conviction is not entered. This is clearly not the situation with Dr. Doe's disposition which involved no admission by him or any adjudication preliminary to probation—or otherwise—by the Court. In order for a judgment of conviction to enter in Dr. Doe's case, there would have had to have been substantial—and non-ministerial—adjudicative activity. Moreover, the legislative history of the amendment makes clear—to the degree that there is any ambiguity in the statute itself—that Congress was, consistent with the reading I give the plain language of the amendment, concerned with those circumstances in which "the actual entry of judgment of conviction" is withheld after admission of involvement in criminal abuse against the health programs. *See generally* H.R.Rep. No. 727, 99th Cong., 2d Sess. 74–75 (1986), 1986 U.S.Code Cong. & Admin.News 3607, 3664–65.

The OIG's interpretation of the Doe disposition is therefore at odds with the plain language of the statute and the legislative history. While the determination of what constitutes a conviction is a matter of federal law, *see, e.g., United States v. Currier*, 821 F.2d 52, 58 (1st Cir.1987); *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 111–13, 103 S.Ct. 986, 991–92, 74 L.Ed.2d 845 (1983), the federal judgment with respect to whether a state proceeding results in a conviction must be informed by consideration of state criminal justice procedure. The OIG here appears innocent of such information but rather

## B

On February 6, 1987, the Regional Inspector General for Investigations of the Department of Health and Human Services sent Dr. Doe a letter informing him of the Department's intent to suspend him from participating in Medicare and Medicaid programs for "conviction" of a program related crime. Counsel for Dr. Doe submitted materials opposing such a suspension. These, however, were rejected by the Inspector General who notified the plaintiff on April 20, 1987, that fifteen days hence he would be suspended from Medicare and Medicaid programs for a period of one year, that the appropriate Massachusetts professional licensing authority would be notified with a request that it take disciplinary action against Dr. Doe, and that publication of the suspension and the purported reasons for it would be made by legal notice in a local newspaper.

## C

Dr. Doe thereupon brought this action in this court. A series of hearings have been held on his request for a temporary restraining order and on his motion for preliminary injunction. An interim injunctive order staying the suspension has been continued pending determination of the motion for preliminary injunction.

## D

Although he had sought a hearing before the Secretary prior to bringing this action, Dr. Doe's administrative proceeding with the Department of Health and Human Services only recently reached the hearing stage. During the series of hearings in this Court beginning May 4, 1987, Government counsel expressed the expectation that the case would be set down before an Administrative Law Judge promptly. *See,* *e.g.,* May 4, 1987 Tr. at 2 ("We anticipate

having the hearing within the next three weeks ...."). A hearing, however, was not in fact held before an Administrative Law Judge until July 22, 1987.

In its most recent submissions to this Court, the Government has represented that a ruling by the Administrative Law Judge should be issued by August 3. The decision of the Administrative Law Judge is subject to further administrative review before a final decision of a Secretary can ripen for judicial action under ordinary circumstances. There is no mechanism for administrative stay pending administrative review of the proposed suspension.

## II

■ Dr. Doe confronts a series of jurisdictional hurdles at the threshold to making his claim in this court at this time. The statutory scheme governing resolution of questions whether a physician should be suspended from Medicare and Medicaid program reimbursement provides judicial review only after a final decision of the Secretary.[6] That final decision is not rendered until the claim is pressed through all designated levels of administrative review. *Heckler v. Ringer,* 466 U.S. 602, 606, 104 S.Ct. 2013, 2017, 80 L.Ed.2d 622 (1984). Judicial review is precluded until the administrative review remedies have been exhausted. *Weinberger, Secretary of Health, Education, and Welfare v. Salfi,* 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975).

■ The jurisdictional requisite has two components in this context. The first may not be waived; this is the necessity that the claim shall have been presented to the Secretary. *Mathews, Secretary of Health, Education, and Welfare v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976). The second is the necessity that

seems determined to extend the statutory definition of "conviction" without regard to distinctions among the protean variety of dispositions of criminal matters in the courts of the Commonwealth.

**6.** Title 42 U.S.C. § 1320a–7(e) provides that "[a]ny person ... who is the subject of an adverse determination made by the Secretary un-

der [Section 1320a–7(a)] ... (is) entitled to reasonable notice and opportunity for a hearing thereon by the Secretary to the same extent as is provided in ... [42 U.S.C. § 405(b)], and to judicial review of the Secretary's final decision after ... (the) hearing as ... provided in ... [42 U.S.C. § 405(g)]." Section 405(g) allows judicial review only after a "final decision" of the Secretary.

the administrative remedies have been exhausted; this is waivable by the Secretary and, alternatively, subject to judicially enforced waiver when a showing has been made 1) that the claim presented to the court raises a constitutional challenge wholly collateral to the substantive claim of entitlement; and 2) that full relief cannot be obtained at a post-deprivation hearing because the claimant will suffer irreparable harm, or be damaged in a way not recompensable through retroactive payments. *Heckler v. Ringer,* 466 U.S. at 617–618, 104 S.Ct. at 2022–23; *Mathews,* 424 U.S. at 330–331, 96 S.Ct. at 900–901.

Dr. Doe has provided the first component. His claim was presented in a timely fashion to the Secretary.

The second component, which the Secretary does not waive, is where Dr. Doe's problems lie. In addressing these issues, a court must be mindful of the Supreme Court's adjuration that "(t)he ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the *Eldridge* factors, but should also be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986). Those policies have been described as "intensely 'practical.'" *Mathews,* 424 U.S. at 331 n. 11, 96 S.Ct. at 901 n. 11. They are designed as a means of:

> preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Weinberger,* 422 U.S. at 765, 95 S.Ct. at 2466–67.

It is tempting to find these purposes of the exhaustion requirement somewhat attenuated here. We deal ultimately with a question of statutory interpretation in evaluating a matter of state criminal practice as to which no particular administrative record is necessary and regarding which the agency can profess to no particular

experience or expertise. *Cf. Heckler v. Ringer,* 466 U.S. at 618 n. 11, 104 S.Ct. at 901 n. 11 (distinguishing between case (i) where "only issue before the courts was the constitutionality of [a] provision, an issue beyond the Secretary's competence," as to which exhaustion was not compelling, and (ii) case where "the disputed question [was medicaid reimbursement coverage for a particular surgical procedure, which] is peculiarly within the Secretary's competence," as to which exhaustion was required).

But the temptation to find diminished force in the policies underlying exhaustion must be resisted in order to deal in a principled and disinterested fashion with the factors upon which judicial analysis of the exhaustion requirement depends. In order to discipline my analysis of the issues, I turn directly to those factors.

### A. *Collateral Constitutional Challenge*

The nature of Dr. Doe's present challenge has not been fully crystallized in his pleadings to date. Although generically styled as a due process claim, the species of due process claim is not clearly framed. It appears that the challenge is directed at perceived shortcomings in the pre- and post-suspension procedures employed by the Secretary for evaluating the propriety of the suspension. But before Dr. Doe can even raise due process concerns he must demonstrate that he faces deprivation of a constitutionally protected interest for which process is due. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

#### 1) Constitutional Interests
##### a) *Property Interest*

Case law in the First Circuit has not recognized any constitutional character to the claim for continued eligibility to reimbursement for Medicare or Medicaid services. In *Cervoni v. Secretary of Health, Education and Welfare,* 581 F.2d 1010, 1018 (1st Cir.1978), the court concluded that "physicians do not have a protectable property interest in their continuing eligibility to bill for reimbursement under" a

particular program. *Cf. Kechijian v. Califano*, 621 F.2d 1, 5 (1st Cir.1980) (reluctantly assuming *arguendo* that plaintiff physician had protected property interest in order to find adequate process available); *see also Koerpel, M.D. v. Heckler*, 797 F.2d 858, 863–65, (10th Cir.1986) (no property right for physician in continuing eligibility for Medicare reimbursement).

Other circuits recently have been more hospitable to the claim that a physician or a provider has a protectable property interest. *See, e.g., Patchogue Nursing Center v. Bowen, M.D.*, 797 F.2d 1137, 1144–45 (2d Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 873–74, 93 L.Ed.2d 928 (1987); *Ram, M.D. v. Heckler*, 792 F.2d 444, 447 (4th Cir.1986); *cf. Ritter, D.O. v. Cohen*, 797 F.2d 119, 122 (3rd Cir.1986).

Since *Cervoni*, the First Circuit has itself engaged in more extended and sophisticated functional analysis of constitutional property interests. For example, in *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981), the Court reviewed the precedent in the analogous area of public employment termination and concluded that:

> [w]hile these decisions provide no perfect touchstone for identifying 'property,' they suggest that the more circumscribed is the government's discretion (under substantive state or federal law) to withhold a benefit, the more likely that benefit constitutes 'property,' ... for the more reasonable is reliance upon its continued availability and the more likely it is that a hearing will illuminate the appropriateness of withholding it in an individual case.

The circumscriptions of the Secretary's discretion by the statutory scheme governing the qualifications of physicians make quite reasonable a physician's expectation that absent a defined "conviction"—a form of just or good cause—he will not be deprived of continued involvement in the programs on grounds of alleged program related criminal conduct. Thus, it is not unreasonable to assume that when a physician such as Dr. Doe cannot under law be terminated or suspended except upon the occurrence of certain specified events, he has a property interest in continued participation in the program. *Cf. Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985).

■ Given the recognition in other circuits of the property rights of a physician or provider in continued participation in Medicare and Medicaid programs and the more sophisticated analysis of property rights in the First Circuit since *Cervoni*, I am inclined to the view that the First Circuit may revisit the issue. In any event, I conclude for purposes of this memorandum that the existing rules and understandings regarding suspension or termination of a physician from the programs at issue here create some sort of a property right for Dr. Doe subject to due process protection.

### b) *Liberty Interest*

■ There is an alternative constitutional interest which case law has recognized as worthy of due process protection for physicians facing suspension: an interest in what should perhaps most accurately be described as "occupational liberty." *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir.1987). This liberty interest has found its clearest articulation in public employment cases but it appears to fit comfortably as a description of the interest implicated when a physician is terminated or suspended on the basis of a "conviction" from the programs the Secretary administers. The elements of a claim of deprivation of an occupational liability interest are termination or suspension coupled with a stigmatizing public statement of government claims. *See, e.g., Laureano–Agosto v. Garcia–Carballo*, 731 F.2d 101, 104–105 (1st Cir.1984). Those elements are present here. The suspension process will, according to the government's representations, be accompanied by a public statement which, if false, would be *per se* libellous: a notice that could reasonably be understood as an assertion that Dr. Doe had been adjudicated guilty of a crime in connection with his profession. The substance of the statements can properly be termed "stigmatizing" because of their likely impact on Doe's freedom to explore other employment opportunities successfully. *Castro v. United*

*States,* 775 F.2d 399, 407 (1st Cir.1985). Although the First Circuit has not addressed the issue of an "occupational liberty interest" in this context, it has been recognized recently in the case law. The Tenth Circuit in *Koerpel,* after declining to find a property interest for the physician, nevertheless held the liberty interest "sufficiently colorable to obtain the jurisdiction of the federal court." 797 F.2d at 866.

Having recognized Dr. Doe asserts a constitutional interest in either property or liberty, I turn to the collateral claims concerning the process he is due to protect those interests.

## 2) Collateral Claims

■ Dr. Doe's due process claims concern the failure of the Secretary to provide him with what he believes are adequate hearing procedures. His claims are colored, no doubt, by his lack of success in convincing the Secretary's delegees of the validity of the merits of his position with respect to the statutory definition of "conviction" before the suspension was announced. But the underlying merits are not ripe for my resolution. The issue is not whether the statute is being interpreted properly, but rather whether the procedures for making that determination are constitutionally adequate. It is only "where the plaintiff does not seek the specific entitlement which is the subject of an administrative proceeding, but rather challenges the standards under which the administrative agency proposes to make the determination, [that] the issue is collateral." *Greene, M.D. v. Bowen,* 639 F.Supp. 554, 560 (E.D.Cal.1986).

### a) *Pre-suspension process*

The pre-suspension process afforded Dr. Doe, while not successful in achieving the result sought by him, appears to be constitutionally sufficient. He received notice of the impending suspension and an opportunity to present a submission. His counsel submitted evidence and briefed the issue and it was rejected by the Office of Inspector General because it "contained no miti-gating factors that would tend to lessen the length of [the] suspension."

The Supreme Court in *Cleveland Bd. of Education v. Loudermill,* 105 S.Ct. at 1495, noted that "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *See also Koerpel,* 797 F.2d at 868–69. What is necessary is an initial check against mistaken decisions. This is what the OIG submission process provided. Dr. Doe was given notice of the grounds upon which suspension was contemplated and an opportunity to submit a response directed to those grounds. As was the case with Dr. Koerpel, Dr. Doe has been afforded all the process that is due him before the suspension can go into effect. Nothing in current Supreme Court case law suggests that a more elaborate pre-suspension process is constitutionally necessary. *See generally, Brock v. Roadway Express, Inc.,* —— U.S. ——, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987); *see also United States v. Charles George Trucking Co.,* 823 F.2d 685, 692 (1st Cir.1987).

The plaintiff's recently formulated argument that, at least at the pre-suspension initial stages of the administrative process, the OIG functions in both an accusatory and a adjudicative mode does not make out a constitutional deficiency. *Brasslett v. Cota,* 761 F.2d 827, 835–37 (1st Cir.1985).

### b) *Post-suspension process*

*Brock* also recognizes that at some point, delay in holding post-suspension evidentiary hearings may become a constitutional violation. 107 S.Ct. at 1750. But the courts have proved remarkably tolerant of administrative delay. Reviewing the case law recently, the Third Circuit held that when dealing not with an indigent but rather with a professional having other potential sources of support, "the mere allegation of a projected twenty-month delay by an agency, although hardly to be encouraged as a matter of administrative practice, does not state a constitutional violation." *Ritter,* 797 F.2d at 124.

It is difficult to assess the length of delay in this case. Despite representations from government counsel during the initial

hearings on this matter that the administrative hearing was imminent, the pace has proved—perhaps predictably—less expeditious than hoped. It is not unreasonable to infer that the administrative process—especially if adverse to Dr. Doe—will consume most if not all the period of the proposed suspension.

While courts have been tolerant of quite substantial administrative delays in hearings, the issue of when administrative delay is too long seems to turn upon whether the administrative review process would be provided "at a meaningful time." *Cleveland Bd. of Education v. Loudermill,* 105 S.Ct. at 1496. This question of "meaningfulness" brings me to the issue of futility in determining whether exhaustion should be waived.

## B. *Futility: Irreparable Harm or Ultimate Availability of Full Relief*

The futility of enduring a one-year suspension while awaiting an administrative hearing which is unlikely to be completed within one year seems obvious. It is an administrative process which functions, to borrow Justice Jackson's telling simile, as "a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards v. California,* 314 U.S. 160, 186, 62 S.Ct. 164, 172, 86 L.Ed. 119 (1941) (Jackson, J., concurring). So long as the post-termination process afforded Dr. Doe is incapable of protecting his ultimate interests in a timely fashion, the concept of exhaustion may fairly be said not merely to describe the process but also the result. Disciplined analysis of this problem, however, is best approached from the familiar perspective of whether Dr. Doe will suffer irreparable harm or otherwise be unable to obtain full relief at the conclusion of the proceeding.

As a matter of classical irreparability analysis, Dr. Doe does not appear to be in a position to show the requisite harm. The Secretary has submitted an affidavit in

which the Government represents that while Dr. Doe may not be compensated by the Medicare program during the period of his suspension, he may receive retroactive compensation if he prevails on the merits of his claim that the suspension was improper. Such back pay would appear to obviate a claim of irreparable harm. *Cf. Sampson, Administrator, General Services Administration v. Murray,* 415 U.S. 61, 90–92, 94 S.Ct. 937, 952–54, 39 L.Ed.2d 166 (1974). Apparently certain case law in this area has proceeded on the assumption that such retroactive compensation is not available, *see e.g. Greene v. Bowen,* 689 F.Supp. at 563, but that assumption is not warranted on the evidence and representations before me. *See generally* Affidavit of James F. Patton. Accordingly, it is clear that to the degree that the irreparable harm caused Dr. Doe by an erroneous suspension is monetary, it is compensable.[7]

Of course to seek retroactive reimbursement, Dr. Doe must provide services for which he will not be compensated on a timely basis during the suspension period. Putting to one side whether Dr. Doe is satisfied by such a contingent deferred payment plan for his services, there is the significant possibility that Dr. Doe will not care to run the risk of failing to prevail and thereby failing ultimately to receive retroactive compensation. But this is a problem which arises whenever interim relief is sought. The classical view of irreparable harm imposes the immediate cost of enduring the course of the proceedings on the party seeking relief if it appears he can ultimately be made more or less whole in a monetary sense. The alternative of imposing the cost of an erroneous interim assessment on the party opposing the relief has been rejected when there is an adequate damage remedy at law. As an allocation of interim cost, this choice is a tolerable compromise of risk shifting which should not be ignored absent some unusual circumstance. *See generally, Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d

---

7. With respect to state programs, the statute provides a separate waiver procedure through which the Secretary may approve a request received with respect to the physician from the state agency responsible for the program. Title 42 U.S.C. § 1320a–7(a)(2)(B). Dr. Doe has not sought to avail himself of the waiver process.

380, 386–87 (7th Cir.1984). The case of an impecunious person for whom interim deprivation of the claimed right would be devastating is an example of the unusual circumstance which can require immediate judicial intervention. *See, e.g. Goldberg, Commissioner of Social Services of the City of New York v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Caswell v. Califano,* 583 F.2d 9, 14 (1st Cir. 1978) (claimants for disability benefits frequently in dire financial circumstances due to disability and cannot be made whole by retroactive payments a year later). But here, where we deal with a professional person capable of making practical judgments about and minimizing his risks during the interim period, no irreparable harm in the monetary sense can be shown.

A separate question is presented by the OIG's undertaking to publicize the suspension before it becomes a final decision subject to judicial review. Massachusetts treats the question of maintaining the privacy of criminal offender record information and the sealing of certain criminal dispositions in its courts as a public policy matter of great importance. *See generally* Arzt, *Privacy Law in Massachusetts: Territorial, Informational and Decisional Rights,* 70 Mass.L.Rev. 173, 184–88 (1985). In what was perhaps its only actual adjudicative act in Dr. Doe's case, the state court ordered the record sealed. Yet the OIG at the outset of the administrative process stated that unsealing would effectively be undertaken by a legal notice placed in a local newspaper.[8] The publication of an inherently stigmatizing allegation is a form

of harm for which a name clearing hearing will not be likely ultimately to provide full relief as a practical matter. But while there is some authority for a narrowly tailored restraining order enjoining only the publication of the suspension, *see Greene,* 639 F.Supp. at 564, more authoritative judicial treatment has been content to deal with the problem of erroneous publication by invoking the anodyne that "[s]ince the purpose of the [post-deprivation] hearing in such a case is to provide the person 'an opportunity to clear his name,' a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause." *Arnett, Director, Office of Economic Opportunity v. Kennedy,* 416 U.S. 134, 157, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974).

Dr. Doe has recently made a further argument for irreparable harm in this case noting the substantial interference suspension would have upon with the psychotherapist-patient relationship he has maintained with the patients he treats. This harm must be asserted derivatively, since Dr. Doe's concern is ultimately a matter which rightfully belongs to his patient to determine and voice. *Cf. Commonwealth v. Kobrin,* 395 Mass. at 287 n. 8, 479 N.E.2d 674.

By whomever asserted, however, the argument is not without force. Even the publication of a notice of suspension may fray the fragile bond between psychotherapist and patient. But the last clear chance to maintain the relationship lies with Dr.

**8.** Some uncertainty surrounded the precise character and content of the notice of suspension. In his April 20, 1987, letter to Dr. Doe announcing the suspension, the OIG reported that "[i]n accordance with 42 U.S.C. § 1320a–7(c), a legal notice will be placed in a local newspaper to advise the public of the effective date and reasons for this action." When requested by the Court to identify the authority for newspaper notice, the Government cited § 1320a–7(d), not subsection (c), which provides for "such reasonable notice to the public ... as may be specified in regulations." The regulation to which the Government cited, 42 C.F.R. § 1001.109, provides generally for notice to the public and designated agencies, organizations, facilities and entities specifically con-

cerned with medical services. However, the specific regulations dealing with the provisions of 42 U.S.C. § 1320a–7(f), I am now informed by the Government—despite the representation in an initial Governmental filing in May ("... such regulations are in the final stages of preparation.")—"are still several months from completion."

There appears to be no regulation governing newspaper publication or prescribing what the content of the notice will be. In a filing made after Court inquiry regarding the matter, the OIG has stated that it will tailor the timing and content of the notice regarding Dr. Doe to avoid using the words "convicted." In addition it has undertaken to provide a similar notice regarding any reversal of the suspension order.

Doe and his patients themselves. Assuming that the disruption of the relationship is not simply a matter of patients' inability to provide payment on a steady basis for Dr. Doe's services—or Dr. Doe's unwillingness to accept such an arrangement—the parties may voluntarily choose to maintain the relationship during the pendency of the hearing. And in any event, while Dr. Doe's claim of irreparability may be compelling, it is comparatively compelling only as a matter of degree. It is no different in kind from the irreparability claim of any doctor who faces the disruption of his patient relationships reeked by suspension. It is apparent that this circumstance without more cannot support a finding of irreparable harm. If it could, no physician could be subjected to suspension. That result Congress plainly did not intend when it committed to the Secretary the authority to suspend or terminate those providing Medicare and Medicaid services.

### III

Dr. Doe's property and liberty rights may well be infringed by immediate suspension and the stigmatizing effect of publication of notice of that suspension. Nevertheless, the process afforded Doe both pre-and post-suspension is of a type which has been recognized as constitutionally adequate. And while his pursuit of administrative exhaustion may prove futile, he does not face irreparable harm or inadequacy of remedy as the courts customarily apply those concepts. Dr. Doe's due process claims do not therefore overcome the administrative exhaustion requirement. Consequently, I decline to enjoin the pending suspension.[9] Moreover, given what is a jurisdictional finding, I must decline to continue to adjudicate any other matters in this case.

Accordingly, it is hereby ORDERED:

(A) That the Plaintiff's Motion for Preliminary Injunction be and hereby is DENIED; and

(B) That this case be and hereby is DISMISSED.

---

9. Having failed to justify waiver of exhaustion, Dr. Doe must endure the incidents of suspension while his question of purely statutory construction is considered and determined in the administrative process. The recent rueful observations of the Supreme Court regarding the limited role of the courts in this setting are pertinent:

> In the best of all worlds, immediate judicial access for [this party] might be desirable. But Congress, in § 405(g) and § 405(h), struck a different balance, refusing declaratory relief and requiring that administrative remedies be exhausted before judicial review of the Secretary's decisions takes place. Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year. If the balance is to be struck anew, the decision must come from Congress and not from this Court.

*Heckler v. Ringer,* 466 U.S. at 627, 104 S.Ct. at 2028.