**MEDIPLEX OF MASSACHUSETTS, INC., d/b/a Sunrise Care and Rehabilitation for Randolph, Plaintiff,**

v.

**Donna E. SHALALA, Defendant.**

**No. CIV.A. 98–12363–DPW.**

United States District Court, D. Massachusetts.

Jan. 19, 1999.

Joseph L. Bianculli, Bianculli & Hoffman, Joseph L. Bianculli, Law Offices of Joseph L. Bianculli, Arlington, VA, for Plaintiff.

Thomas E. Kanwit, United States Attorney's Office, Boston, MA, Cliff Pierce, Health and Human Services, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

The owner and operator of a Massachusetts skilled nursing facility sought a preliminary injunction extending a temporary restraining order granted by the United States District Court for the District of Columbia enjoining the Secretary of the United States Department of Health and Human Services from terminating the nursing facility's status as a provider of medical services under the Medicare and Medicaid programs and from cutting off the facility's Medicare and Medicaid reimbursements. The plaintiff asserted that the Secretary's actions exceed her authority and will cause irreparable harm. The defendant opposed the motion for a preliminary injunction and in turn moved to dismiss the case for lack of jurisdiction. At a hearing in this matter, I denied the motion to dismiss and extended the temporary restraining order and provided an oral statement of my reasons for doing so. This memorandum provides a more extended written memorandum reflecting my determination to continue to provide preliminary injunctive relief.

## I. BACKGROUND

Plaintiff Mediplex of Massachusetts, Inc. ("Mediplex") owns the facility at issue in this case, SunRise Care and Rehabilitation for Randolph Center, a/k/a Randolph Crossings Nursing Center ("Randolph Crossings"), a 168–bed skilled nursing facility in Randolph, Massachusetts. Mediplex is a wholly-owned subsidiary of The Mediplex Group, Inc., which is, in turn, a wholly-owned subsidiary of Sun Healthcare Group, Inc., a large company which operates many nursing facilities across the country. Randolph Crossings has participated in the Medicare and Medicaid programs since it opened in 1989.

## A. The Programs

Medicare is a federally-administered program that provides funding for a range of medical services directed to qualifying elderly or disabled people. Medicaid is a state-administered program that provides funding for medical services for people below specified income levels. The federal government reimburses the states for part of their Medicaid expenditures. Both programs provide funding for nursing home services, with the federal or state government directly paying facilities for services to program beneficiaries.

To qualify for funding from either program, a facility must be certified periodically based on on-site surveys as meeting a series of health and safety requirements. The facility must enter into a provider agreement with the Secretary of Health and Human Services ("the Secretary") for Medicare and with the state for Medicaid. In Massachusetts, the relevant surveys for Medicare and Medicaid certification are done by the Massachusetts Department of Public Health ("DPH"). *See generally Lake County Rehabilitation Center, Inc. v. Shalala*, 854 F.Supp. 1329, 1332 (N.D.Ind. 1994).

## B. The Certification Surveys

Certification surveys in May 1996 and March 1997 and DPH reports in January 1998 indicated various deficiencies and violations by Randolph Crossings, but these problems did not endanger the facility's certification status.

On April 1, 1998, DPH completed a re-certification survey of Randolph Crossings, based on which it concluded that the facility was out of compliance with various Medicare requirements and that these violations posed an immediate threat to the facility's residents. The Health Care Financing Administration ("HCFA"), an agency which determines whether facilities are in compliance with Medicare and Medicaid regulations for the Department of Health and Human Services ("HHS"), notified the facility that its Medicare provider agreement would be terminated on April 15 if the immediate threat was not removed. A follow-up survey conducted April 14, 1998, determined that Randolph Crossings had made some progress but had failed to remove the immediate jeopardy to its residents. HCFA extended the termination date until April 23, 1998, and DPH concluded from an April 23 survey that the facility had removed the immediate jeopardy but still had widespread deficiencies. Based on Randolph Crossings' progress, the HCFA extended the termination date to July 3, 1998. DPH surveyed the facility again on June 2 and July 1, 1998, each time finding that it had not achieved substantial compliance with the Medicare requirements. The HCFA again extended the termination date, this time until October 1, 1998. DPH concluded based on a survey conducted on September 29, 1998 that Randolph Crossings remained out of compliance with the program's requirements, and HCFA notified the facility on October 1, 1998 that its provider agreement was terminated effective that day and that no further payments would be made by Medicare after October 31, 1998.[1]

Plaintiff disputes the severity of some of the deficiencies found by DPH and contests the conclusions reached by the state and federal agencies, but does not dispute the basic sequence of events set out by the state. Both sides agree that there was no finding of immediate jeopardy to the health and safety of residents at the time that the final termination decision was made.

## C. Plaintiff's Response

Faced with termination, the plaintiff has pursued two parallel tracks.

---

1. The violations found by DPH at Randolph Crossings were primarily medication errors, but also included failures to adequately treat wounds and failures to protect residents, among others. Some of the alleged violations had serious effects on residents. Plaintiff disputes the DPH findings.

First, plaintiff has sought recertification. DPH conducted another survey on October 31—November 2, 1998 and found one deficiency, which DPH verified had been corrected by November 5. DPH concluded that Randolph Crossings had regained substantial compliance with the Medicare regulations and will do a follow-up survey which will lead to Randolph Crossings' recertification if substantial compliance is again found. (Freedman Aff. ¶¶ 3–5.)

Second, plaintiff initiated this litigation. On November 9, 1998, Mediplex requested, and Judge Sporkin in the District of the District of Columbia granted, a temporary restraining order restraining the Secretary from terminating Medicare and federal Medicaid payments for residents of Randolph Crossings. After entering the requested temporary restraining order, Judge Sporkin transferred venue to this court.

## II. MOTION TO DISMISS

It is necessary first to discuss the jurisdictional question raised by the defendant in her motion to dismiss.

■ The Secretary argues that Mediplex may not bring this action, or, more precisely, that this court does not have jurisdiction to decide it because a terminated provider may obtain judicial review of the termination only after exhausting its administrative remedies. 42 U.S.C. § 405(h) says:

> No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any other officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

This section is read together with 42 U.S.C. § 405(g), which provides an individual may challenge in federal courts "any final decision of the Commissioner of So-

cial Security made after a hearing to which he was a party," and 42 U.S.C. § 1395ii, which applies § 405 to the Medicare Act and the Secretary of Health and Human Services. Thus a party may generally only challenge a decision of the Secretary in federal court when that decision is final, a status which involves exhausting a three-stage administrative review process. *See Bowen v. City of New York*, 476 U.S. 467, 482, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

This scheme for Medicare decisional review, however, does not affect Medicaid review. In this connection, I note that the Medicaid Act contains no provision comparable to 42 U.S.C. § 1395ii and thus does not incorporate § 405(g) and (h). As a result, Mediplex may presumably pursue its Medicaid claim pursuant to 28 U.S.C. § 1331 without regard to any exhaustion requirement applicable to Medicare claims. *See Illinois Council on Long Term Care Inc. v. Shalala*, 143 F.3d 1072, 1076 (7th Cir.1998).

■ Moreover, Mediplex's Medicare claim is subject to the exception the Supreme Court created to § 405's exhaustion requirement for cases which are "entirely collateral" to the substantive claim of entitlement. *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This exception applies "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Id.* The Court subsequently held that when the case involves simply a dispute over benefit payments and no meaningful showing of injury that cannot be remedied by later payment of benefits, the exhaustion requirement will be enforced to deprive the courts of jurisdiction in such Medicare matters. *Heckler v. Ringer*, 466 U.S. 602, 615–18, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). However, as *Heckler* suggests and the Court has on other occasions made explicit, "application of the exhaustion doctrine is 'intensely practical.'" *Bowen v. City of New York*, 476 U.S. at 484, 106 S.Ct. 2022 (quoting

*Eldridge*, 424 U.S. at 331 n. 11, 96 S.Ct. 893). Applying these principles in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Court held that while § 405 restricted judicial review of "amount determinations" of benefits, it does not restrict judicial review of "statutory and constitutional challenges to regulations promulgated by the Secretary." *Id.* at 678–80, 106 S.Ct. 2133.

The First Circuit has developed the Supreme Court's analysis of § 405 further, explaining that the exhaustion requirement is waived "for example, when a plaintiff attacks the lawfulness of an important 'systemwide' agency policy", but not when the plaintiff's claims raise issues for which the agency's expertise may be helpful or which are "more closely confined to the facts of a particular case". *Doyle v. Secretary of Health & Human Servs.*, 848 F.2d 296, 300 (1st Cir.1988).

■ Neither the Supreme Court nor the First Circuit has resolved the precise issue before me. It appears, however, that every reported decision to which I have been directed has found a challenge to the Secretary's authority in this setting to be a collateral issue to which the exhaustion requirement does not apply. The general view is that "a claim challenging the Secretary's authority for failure to adhere to the specific requirements of the Medicare Act in ordering a 'termination' of benefit payments is 'entirely collateral' to a claim for benefits and, therefore, falls outside the jurisdiction restrictions of § 405(g) and 405(h)." *Libbie Rehabilitation Center, Inc. v. Shalala*, 26 F.Supp.2d 128, 130–31 (D.D.C.1998). *Accord International Long Term Care, Inc. v. Shalala*, 947 F.Supp. 15, 17–19 (D.D.C.1996); *Lake County Rehabilitation Center, Inc. v. Shalala*, 854 F.Supp. 1329, 1336 (N.D.Ind.1994); *Claridge House, Inc. v. United States Dep't of Health & Human Servs.*, 795 F.Supp. 1393, 1401 (S.D.Ohio 1991); *Mountview Nursing & Rehabilitation Center, Inc. v. United States Dep't of Health & Human*

*Servs.*, Civ. A. No. 1:CV–93–1692, slip op at 5–6 (M.D. Pa. Nov. 17, 1993). Judge Sporkin, in granting the temporary restraining order in this case, adopted the same reasoning. *See Mediplex of Massachusetts, Inc. v. Shalala*, Civ. A. No. 98–2440, slip op. at 4 (D.D.C. Nov. 9, 1998).

I agree with these decisions. The Mediplex challenge to the Secretary's authority raises general questions of statutory construction; moreover, equitable concerns regarding irreparable harm are implicated. This is not a benefits claim case. The legal issues of secretarial authority presented here do not rely at all on the facts of this particular case. These factors point in favor of finding the claim to be collateral. As Judge Lozano observed, in terms equally applicable to this case:

> Plaintiff's cause of action does not require the Court to address the merits of the Secretary's decision to terminate Plaintiff's provider agreement. Instead, the issue before the Court solely addresses a question of law regarding the scope of the Secretary's power. Moreover, Plaintiff has demonstrated a compelling need for prompt judicial review.

*Lake County*, 854 F.Supp. at 1336. Such a case fits precisely into the exception the Supreme Court carved out in *Eldridge* and the First Circuit refined in *Doyle*.

I note, moreover, that the Administrative Law Judge who will consider the merits of the Secretary's decision to terminate Randolph Crossings' provider agreement does not have the authority to decide whether the Secretary had the power to terminate the agreement. *See* 42 C.F.R. § 488.408(g) (a facility may appeal a finding of noncompliance administratively, but "may not appeal the choice of remedy"). The ALJ also lacks the power to grant a preliminary injunction staying the termination of payment to the facility pending his review. *See International Long Term Care*, 947 F.Supp. at 19. For these important issues to be considered at all, they must be considered by this court at this time in this litigation. Finding that the

issues are "entirely collateral" to the substantive consideration of the Secretary's noncompliance determination—which must be fully resolved administratively before coming to a federal court—I have denied the Secretary's motion to dismiss and now turn to the plaintiff's motion for preliminary injunction.

### III. Motion for Preliminary Injunction

The First Circuit's standard for granting a preliminary injunction is well established:

A district court must weigh four factors: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the hardship of the nonmovant if the injunction issues as contrasted with the hardship to the movant if interim relief is withheld; and (4) the effect on the public interest of a grant or denial of the injunction.

*DeNovellis v. Shalala*, 135 F.3d 58, 62 (1st Cir.1998). "The four factors must be considered together and are interrelated in that the strength of one factor may offset the weakness of another and vice versa". *Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221 (1st Cir.1993), *cert. denied*, 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

In assessing the interrelated strengths of the several factors, I am influenced by Judge Friedman's opinion in *International Long Term Care, Inc. v. Shalala*, 947 F.Supp. 15 (D.D.C.1996), granting a preliminary injunction enjoining the Secretary from terminating a nursing home from the Medicare and Medicaid programs until an Administrative Law Judge considered the facility's appeal on the merits. Judge Friedman did not consider the issue of the Secretary's authority. Instead, he found the likelihood of success requirement fulfilled because the plaintiff had "presented a sufficiently 'substantial case' that it might well prevail on the merits after it has exhausted its administrative

remedies." *Id.* at 19. Judge Friedman conceded that he could not review the Secretary's substantive decision to terminate the facility before the ALJ ruled on the case, but concluded that, because the facility would be shut down without a preliminary injunction, thereby making the administrative review moot, the plaintiff fulfilled its requirement by showing some chance of prevailing eventually. *Id.* He based his decision primarily on equitable considerations. "The Court's equitable power to fashion injunctive relief is meant precisely to permit the Court to maintain the status quo pending an administrative decision such as this one, particularly where the failure to do so may result in the eviction of these elderly and infirm residents only days before the ALJ makes his decision." *Id.* at 20.

Judge Friedman's equitable analysis is compelling. The Medicare Act establishes that a terminated facility must exhaust its administrative remedies before a court may consider the merits of the termination decision, but the Administrative Law Judge has no power to stay the termination pending consideration. *Id.* at 19. As a result, a special focus on the use of the court's equitable powers to maintain the status quo seems appropriate. To be sure, as Mediplex concedes, "Section 405(g) does provide that the Court does not yet have jurisdiction to address the merits of the Secretary's factual allegations of noncompliance." (Pl.'s Resp. to Def.'s Mot. to Dismiss at 2.) Jurisdiction over this case, as explained above, however, depends on my consideration of an issue entirely collateral to the immediate availability of benefits—the Secretary's statutory authority to undertake the termination itself in the absence of a present and immediate threat to the health and safety of residents. Thus, I will evaluate plaintiff's likelihood of success on this statutory issue, rather than consider its likelihood of success in eventually challenging the Secretary's substantive decision, and in doing so I will weigh heavily the equitable

considerations identified by Judge Friedman.

## A. Likelihood of Success on the Merits

The Medicare and Medicaid Acts are ambiguous at best about what remedies are available to the Secretary when a nursing facility is found to be out of compliance with program requirements but not posing an immediate threat to the health and safety of residents. Prior to 1987, in such a case, the Secretary could either terminate the facility's provider agreement or deny payment for new admissions. *See Lake County Rehabilitation Center, Inc. v. Shalala,* 854 F.Supp. 1329, 1332 (N.D.Ind. 1994). The Omnibus Budget Reconciliation Act of 1987, however, amended the Social Security Act with respect to the enforcement of Medicare and Medicaid requirements, expanding and possibly altering the choice of remedies available to the Secretary, HCFA, and the states. *See id.*

The relevant provision of the Medicare Act currently states:

(2) Secretarial authority

(A) In general

With respect to any skilled nursing facility in a State, if the Secretary finds, or pursuant to a recommendation of the State under paragraph (1) finds, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), (d), or (e) of this section, and further finds that the facility's deficiencies—

(i) immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in subparagraph (B)(iii), or terminate the facility's participation under this subchapter and may provide, in addition, for one or more of the other remedies in subparagraph (B); or

(ii) do not immediately jeopardize the health and safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B).

Nothing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies.

42 U.S.C. § 1395i–3(h)(2). Subparagraph (B) sets out three "[s]pecified remedies": denial of payment, civil money penalties, and appointment of temporary management. 42 U.S.C. § 1396i–3(h)(2)(B). Subparagraph (B) specifically does not include termination of the facility's provider agreement. The Medicaid Act contains a parallel set of provisions. *See* 42 U.S.C. § 1396r(h)(3)(B)-(C).

The structure of the statutory scheme arguably supports plaintiff's argument. The Medicare and Medicaid Acts provide that, upon a finding of immediate jeopardy, the Secretary *must* either terminate the facility or appoint temporary management and may also impose a remedy from subparagraph (B). With a facility that is out of compliance, but poses no immediate threat, this provision says that the Secretary *may* impose any remedy from Subparagraph (B), which does not include termination of the facility's provider agreement. This section, entitled "Secretarial Authority," appears to provide a basis for the position that the Secretary lacks the authority to terminate a facility in the absence of immediate jeopardy because that authority is not made express. Two courts have found this reasoning persuasive. *See Claridge House, Inc. v. United States Dep't of Health & Human Servs.,* 795 F.Supp. 1393, 1403–04 (S.D.Ohio 1991) ("[I]f the Secretary could terminate a facility with or without a finding of immediate jeopardy, there would be little point in distinguishing, as paragraph (3)(B) clearly does, between situations of immediate jeopardy and situations of no immediate jeopardy."); *Mountview Nursing & Rehabilitation Center, Inc. v. United States Dep't of Health & Human Servs.,* Civ. A. No. 1:CV–93–1692, slip op. at 6–7 (M.D.Pa. Nov. 17, 1993).

The savings clause at the end of the relevant section of both statutes complicates matters, however, providing that "[n]othing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies." 42 U.S.C. § 1395i–3(h)(2)(A); 42 U.S.C. § 1396r(h)(3)(B). And the Secretary points to two other statutory sections which appear to give her power to terminate even when no immediate jeopardy is found, arguing that the savings clause allows these sections to control.

Before turning to these other relevant sections, I must note the *Claridge House* court's statement that the savings clause does not bring in termination provisions from elsewhere in the statute because termination is not a remedy. 795 F.Supp. at 1404. "Unlike denial of further payments, imposition of civil penalties, and appointment of temporary management, the remedies expressly set forth in paragraph (3)(C), termination of a facility's provider agreement cannot be seen as a means to 'remedy a nursing facility's deficiencies.'" *Id.* The *Lake County* court rejected this argument, stating, "Termination obviously is a remedy in that it requires a noncomplying facility to correct its deficiencies in order to become eligible to reapply for Medicare participation." 854 F.Supp. at 1340. I agree that the *Claridge House* court's argument is not persuasive. While termination may be a Draconian remedy, in that it could lead to the closure of a facility and involuntary transport of residents, the statutory scheme nonetheless sets it up as a remedy the potential for which will lead a facility either to improve and apply for recertification or to remedy its deficiencies by no longer operating at all. Turning then to the additional statutory provisions addressing the issue of termination referenced by the Secretary, I find support for her position.

First, both acts contain a section that provides:

The Secretary may continue payments, over a period of not longer than 6 months after the effective date of the findings, under this subchapter with respect to a skilled nursing facility not in compliance with a requirement of subsection (b), (c), or (d) of this section, if—
(i) the State survey agency finds that it is more appropriate to take alternative action to assure compliance of the facility with the requirements than to terminate the certification of the facility …

42 U.S.C. § 1395i–3(h)(2)(C) (Medicare); 42 U.S.C. § 1395r(h)(3)(D) (Medicaid). These provisions are relevant for two reasons. First, they seem to authorize the Secretary to terminate a facility's certification when the state agency finds that it is not "more appropriate" to continue payments and take alternative action—without regard to whether there was in fact a finding of immediate jeopardy. Second, they appear to mandate an end to payments six months after a finding of noncompliance if the failure is not corrected. In this case, Randolph Crossings was determined to be out of compliance April 1, 1998, and the Secretary decided to terminate the facility six months later on October 1, 1998. The Secretary argues that to read the statutes as requiring immediate jeopardy for termination would render this provision meaningless, violating the rule of statutory construction that "we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). These provisions do seem to provide for termination after six months of non-compliance and at the discretion of the Secretary within the six-month period in all cases. It is possible to read these guidelines as applicable only for immediate jeopardy cases. Such an interpretation would make it consistent without being superfluous, although demanding a somewhat forced reading. In addition, cutting off payments after six months is not necessarily the same as terminating a facility's provider agreement, which would

require recertification rather than simply a resumption of payment.[2]

Another provision of the Medicare Act, which applies to all providers, rather than specifically to nursing facilities, states:

> The Secretary may refuse to enter into an agreement under this section or, upon such reasonable notice to the provider and the public as may be specified in regulations, may refuse to renew or may terminate such an agreement after the Secretary—(A) has determined that the provider fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder, or with a corrective action . . .

42 U.S.C. § 1395cc(b)(2). The Medicaid Act does not appear to have a parallel provision.[3] This section authorizes termination of any provider, regardless of immediate jeopardy, who fails to comply substantially with the Medicare requirements.[4]

The *Mountview* court held that § 1395cc(b)(2) does not override the distinction in § 1395i–3(h)(2) between immediate jeopardy cases and 'no immediate jeopardy' termination authority. Slip op. at 7. The *Mountview* court concluded that to find that § 1395cc(b)(2) allows termination in any case of non-compliance "would violate at least two fundamental maxims of statutory construction: (1) that a specific statutory provision prevails over a general provision within the same statute; and (2) that the court should not interpret one provision so as to nullify the operative effect of another provision." *Id.* Neither of these problems occur, however, if § 1395i–3(h)(2) is read to expand the Secretary's choice of remedies in 'no immediate jeopardy' cases rather than to restrict her authority to terminate agreements. Indeed, the *Lake County* court held that a finding that § 1395cc(b)(2) does not provide authority to terminate in 'no immediate jeopardy' cases would violate one of the same statutory maxims, because it would cause the savings clause in § 1395i–3(h)(2)(A) ("Nothing in this subparagraph shall be construed as restricting . . .") to be without operative effect.

Judge Lozano in *Lake County* sought to reconcile the two potentially conflicting statutory provisions, finding that the Secretary always has the authority to terminate, but is afforded greater discretion to choose a remedy if there is no immediate jeopardy:

> [T]he statute [§ 1395i–3(h)(2) ] should be interpreted as a guidepost for the Secretary rather than as a limit on her powers. The immediate jeopardy provision mandates certain actions which the Secretary must take when a facility is found to immediately jeopardize the health or safety of its residents. The Secretary has no discretion; she must terminate the facility's participation in Medicare or appoint temporary management. However the nonimmediate jeopardy provision grants the Secretary discretion, allowing (but not requiring) her to apply certain listed intermediate remedies rather than the more extreme sanctions to facilities found noncompliant that do not immediately jeopardize the health or safety of their residents.

854 F.Supp. at 1340. I find the *Lake County* analysis compelling. It allows §§ 1395i–3(h)(2) and 1396r(h)(3) to have a meaningful effect—providing the Secre-

---

2. The Secretary's regulations, however, do specify that HCFA may either terminate a facility's provider agreement or discontinue funding if compliance is not achieved within six months. 42 C.F.R. § 488.450(d).

3. The *Claridge House* opinion, which deals only with termination of a Medicaid provider agreement, does not address this section at all.

4. The Secretary's regulations clearly apply this provision to nursing facilities: "HCFA and the State may terminate a facility's provider agreement if a facility—(i) Is not in substantial compliance with the requirements of participation, regardless of whether or not immediate jeopardy is present". 42 C.F.R. § 488.456.

tary with an expanded choice of remedies in cases with no immediate jeopardy—without requiring that § 1395cc(b)(2) be overridden, the savings clauses be rendered essentially meaningless, and the six month termination requirements be restricted.[5]

■ On reflection, I find the statutory arguments weigh slightly in the government's favor. The Medicare and Medicaid Acts as a whole establish a regime in which the Secretary has discretion, among other remedies, to terminate a non-complying facility's provider agreement, even when there is no finding of immediate jeopardy. However, the language of §§ 1395i–3(h)(2) and 1396r(h)(3) can be read to say that the Secretary has no authority to terminate in such a case, and certain courts have reached this conclusion. As a result, in the absence of controlling authority, I find the plaintiff has some likelihood of success on the merits of its statutory claim, if not necessarily a substantial likelihood, and I will move on to the remaining components of the preliminary injunction test.

## B. Balance of Harm

1. *Harm to Plaintiff if Preliminary Injunction Does Not Issue*—Mediplex asserts two types of irreparable harm. First and foremost, it asserts that termination of its provider agreement will result in harm to the residents of Randolph Crossings. Mediplex argues that, because virtually all of Randolph Crossings' residents are enrolled in the Medicare or Medicaid programs, it will have to shut down the facility if it stops receiving Medicare and Medicaid funds. (Pl.'s Mem. at 20.) Shutting down the facility will require transferring all of its residents to other facilities. Mediplex

asserts, and supports with extensive evidence, that the transfers will result in "transfer trauma" for many of its frail and elderly patients, resulting in physical deterioration and even death. Mediplex has submitted numerous affidavits from nurses and doctors stating that transfer will be physically and psychologically dangerous for many of Randolph Crossings' residents. (Pl.'s Exs. 5a–5i, 5x.) In other affidavits, residents report that they are comfortable at Randolph Crossings and suggest that they might deteriorate or die if forced to move. In yet other affidavits, family members of residents assert that their relatives might deteriorate if forced to move and that a move could distance them from their relatives and strain family relations. (Pl.'s Exs. 5j–5w.)

Mediplex further asserts irreparable harm directly to itself as a company. The plaintiff claims that termination will force it to close Randolph Crossings "as it would not be economically feasible to keep the facility open to serve a handful of 'private pay' residents", causing economic harm to the company. (Pl.'s Mem. at 20 .) I find this form of irreparable harm less compelling.

■ The Secretary contests plaintiff's assertion of irreparable harm in several ways. First, the Secretary argues that plaintiff cannot argue irreparable harm on behalf of the residents. In *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), the Supreme Court found that residents of a nursing home did not have standing to challenge the government's decertification of that facility. However, while the residents here do not formally have standing to appear before the court, I find that their interests are still relevant in evaluating

---

**5.** The legislative history also appears to support such a reading. A Congressional report discussing the 1987 amendments to the Medicare and Medicaid Acts said that the amendments "would greatly expand the remedies available to the Secretary under current law." H.R.Rep. No. 100–391(I), at 475 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–

295; *see also Lake County,* 854 F.Supp. at 1340. This and similar statements suggest that Congress did not intend to limit the Secretary's authority to terminate a facility's provider agreement; as noted above, before 1987, the Secretary had such authority to terminate in all cases of non-compliance.

irreparable harm for the equitable determination whether or not to grant a preliminary injunction. *See International Long Term Care*, 947 F.Supp. at 20 (rejecting the argument advanced by the Secretary here and noting that "the Court must consider the potential harm to the residents, to the plaintiff and to the Medicare system as a whole and not whether that harm is placed definitionally in the 'irreparable harm' box or in the 'public interest' box."). Mediplex has an interest in protecting the health of its residents and may assert harm to them as irreparable harm for the purpose of this motion.

The Secretary next asserts that Randolph Crossings will not in fact have to shut down, thus avoiding the harm of "transfer trauma." DPH does not require a facility whose provider agreements are terminated to relocate facility residents and actually requires a facility to go through elaborate procedures if it chooses to do so. (Pontikas Decl., Def.'s Ex. L, ¶¶ 11, 3–9.) Moreover, the government's attorneys told Judge Sporkin in an earlier hearing in this case that "as long as the Facility is complying with the applicable regulations the Secretary does not want the residents transferred." *Mediplex*, Civ. A. No. 98–2440, slip op. at 9. However, as Judge Sporkin observed, "It is difficult for this Court to discern what right the Secretary has to keep the residents at the Facility without reimbursing the Facility for their upkeep." *Id.* Indeed, the United States Code seems to require transfer of residents in the Medicare and Medicaid program if the provider agreement is terminated. "If the facility's participation under this subchapter is terminated, the State shall provide for the safe and orderly transfer of the residents eligible under this subchapter ...." 42 U.S.C. § 1395i–3(h)(4). The Secretary's contention that the facility need not close seems dependent first upon ignoring the purpose and language of the Medicare and Medicaid statutes and second upon Mediplex voluntarily footing the bill for the residents of Randolph Crossings until it is recertified. Neither of these seems plausible.

■ It is worth noting, however, that Mediplex's parent company, Sun Healthcare Group, Inc., is apparently a multi-billion dollar national corporation. (Def.'s Mem. at 31.) Plaintiff may, then, be able to afford to subsidize the residents itself while applying for recertification. In addition, the presence of a wealthy parent company may mitigate a finding of irreparable harm to Mediplex because of financial losses. *Cf. Petraco–Valley Oil & Refining Co. v. United States Dep't of Energy*, 633 F.2d 184, 200 (Temp.Emp.Ct.App.1980) ("No determination of irreparable injury to Petraco is possible, without a showing of the data concerning ownership and the financial condition of the parent company.") Nonetheless, I conclude that the residents' continued presence at Randolph Crossings after termination is unsettled and dependent on the willingness of Mediplex' grandparent company to engage in financial sacrifice. Such an uncertain possibility does not greatly mitigate my finding of irreparable harm to the residents.

■ Finally, the Secretary calls into doubt whether "transfer trauma" is in fact a real danger and suggests that the patients might in fact be better off in a superior facility. *O'Bannon*, 447 U.S. at 804, 100 S.Ct. 2467 (Blackmun, J., concurring) ("Substantial evidence suggests that 'transfer trauma' does not exist, and many informed researchers have concluded at least that this danger is unproved."). *But see id.* at 775, 100 S.Ct. 2467 (Stevens, J., writing for the Court) ("[W]e recognize that such a revocation may be harmful to some patients ...."); *Libbie Rehabilitation Center, Inc. v. Shalala*, 26 F.Supp.2d 128, 132 (D.D.C.1998) ("[T]he likelihood of irreparable injury in dislocating the residents of Libbie is clear and strongly influences this Court's conclusion that the preliminary injunction should issue."); *Lexington Management*

*Co. v. Missouri Dep't of Soc. Servs.,* 656 F.Supp. 36, 41 (W.D.Mo.1986) (recognizing "uncontroverted evidence" of transfer trauma, a condition which "commonly afflicts nursing home residents who are suddenly forced to vacate familiar surroundings" and can even cause death). On this record, I must find that the potential for transfer trauma has been established, leading to potential harm of substantial dimensions should the preliminary injunction plaintiff seeks not be entered.[6]

■ I also find that termination would likely cause irreparable harm to Mediplex because it would likely lead to closure of the facility, which could wipe out the company. *See Claridge House,* 795 F.Supp. at 1405. The fact that Mediplex's parent company would survive intact and might be able to bail out Mediplex mitigates but does not eliminate this irreparable harm. Considering that almost all of Randolph Crossings' patients are enrolled in the Medicaid or Medicare programs, the assertions by several courts that a terminated nursing home would not be harmed because it could rely on private patients or because it could be recertified for those programs do not apply. *See Wayside Farm, Inc. v. United States Dep't of Health & Human Servs.,* 863 F.2d 447, 453 (6th Cir.1988); *Northlake Community Hosp. v. United States,* 654 F.2d 1234, 1242 (7th Cir.1981). This, however, is not irreparable harm, I find, of significant weight when compared to the potential harm in transfer for the residents of Randolph Crossings.

2. *Harm to Defendant if Preliminary Injunction Does Issue*—Several courts have found that there is very little harm to the government resulting from an injunction preventing termination. *See International Long Term Care,* 947 F.Supp. at 19

("The Court does not perceive any harm to the government in permitting the ALJ to reach promptly the merits of a live controversy rather than forcing him to wait until after plaintiff is financially dysfunctional and the residents have already been moved."); *Libbie,* 26 F.Supp.2d at 132–33 ("[I]t is also in the best interest of the Government where an 'immediate jeopardy' finding has not been made that the Facility be brought into compliance with the applicable regulations, thereby obviating the need to relocate the residents.").

■ I do not find the analysis to be quite so simple, however. The government has a general but important interest in the rigorous enforcement and proper administration of the Medicare and Medicaid systems. *See Greenspan v. Klein,* 442 F.Supp. 860, 862 (D.N.J.1977). More specifically, Congress, in enacting the 1987 amendments, was concerned about a "yo-yo" or "roller coaster" phenomenon among nursing facilities, such that facilities which were chronically out of compliance when surveyed temporarily corrected the deficiencies found in the surveys and then relapsed into non-compliance until the next survey. H.R. Rep. 100–391(I), at 475 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–291. *See also Lake County,* 854 F.Supp. at 1340. Randolph Crossings has such a pattern, alternating indefinitely between temporary compliance and slips into non-compliance. Enjoining the Secretary here would allow the facility to continue to do so. The Secretary's termination of Randolph Crossings could send a signal that consistent substandard service will result in serious action even if there is not an immediate threat of harm and would presumably advance the deterrent goals of the Secretary's enforcement efforts. Consequently, I find that the Secretary would experience some cognizable harm if enjoined here. Nonetheless, I find that, on

---

**6.** I note that the record here demonstrating a unique irreparable harm if the preliminary injunction is not granted distinguishes this case from the psychiatrist Medicare/Medicaid suspension dispute I addressed in *Doe v. Bow-* *en,* 682 F.Supp. 637 (D.Mass.1987). The potential irreparable harm to the health and safety of a number of patients affected by this case substantially outweighs the individual financial and reputational harm at issue in *Doe.*

balance, the immediate harm to the persons plaintiff serves far outweighs the more generalized harm to the Secretary.

### C. Public Interest

 Because of the public nature of the dispute in this case, the public interest mirrors factors already considered. Maintaining the health and safety of the residents of Randolph Crossings by preventing an unnecessary transfer is clearly in the public interest. *See Libbie,* 26 F.Supp.2d at 132. Ensuring an effective enforcement mechanism and promoting the health and safety of residents by requiring high standards at nursing facilities is also clearly in the public interest. As one court observed, however, where there is no immediate jeopardy to the residents, the interests of avoiding a harmful disruption of their lives outweighs the regulatory interests involved. *Claridge House,* 795 F.Supp. at 1405. "Under no circumstances would this Court interfere with the Secretary's action if it found that the residents' interests would be adversely affected by remaining at the Facility." *Libbie,* 26 F.Supp.2d at 133. But where there is no immediate threat to the residents, the public interest lies with keeping them in the nursing home pending a final determination on the merits.

### D. Ultimate Weighing

This is a close case, and balancing all four preliminary injunction factors here is difficult. After engaging in the requisite balancing exercise, I find that plaintiff's preliminary injunction should be granted. While the legal question is close and might even lean against the plaintiff, the equitable considerations of irreparable harm, balancing the hardships, and the public interest broadly all counsel toward preventing the termination of Randolph Crossings' provider agreement. These interests, particularly the potential harm to the residents of Randolph Crossings, are decisive. I will preliminarily enjoin the Secretary from terminating the agreement unless or until she finds that the residents are in immediate jeopardy or until I make a final decision about the Secretary's authority.

### III. CONCLUSION

For the reasons stated above, the defendant's motion to dismiss is DENIED. The plaintiff's motion for a preliminary injunction is GRANTED. The parties shall appear for a scheduling conference on February 18, 1999, at 2:45 p.m. They shall file a joint status report on or before February 15, 1999.